# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | | |
|---|---|---|
| PERRY FRANKS, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | NO. 1:06-0018 |
| | ) | JUDGE HAYNES |
| CHERRY LINDAMOOD, WARDEN, | ) | |
| | ) | |
| *Respondent.* | ) | |

## M E M O R A N D U M

Petitioner, Perry Franks, a state prisoner, filed this action under 28 U.S. C. § 2254 seeking

to set aside his convictions for aggravated kidnapping and aggravated rape that are based upon

his guilty plea. Petitioner received a sentence of 15 years on his rape conviction concurrent with

a separate 15 years sentence on his aggravated kidnapping conviction. Petitioner's claims are

that he was denied effective assistance of trial counsel because: (1) his counsel erroneously

advised him that if he pled guilty, Petitioner could be released on parole in eight (8) years; and

(2) his counsel refused Petitioner's request shortly after his plea to file a motion to withdraw his

plea.

Before the Court is Respondent's motion to dismiss (Docket Entry No. 22), contending in

sum, that some of Petitioner's claims are exhausted, but without merit and others claims are

procedurally defaulted. Respondent argues the state courts' decisions upholding Petitioner's

guilty plea are reasonable determinations of facts in light of the evidence in the state court record

and are neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner has filed a cross motion to grant the petition (Docket Entry No. 23) and

response to the Respondent's motion to dismiss. Id. The attachment to Petitioner's cross motion

is his amended petition. In essence, Petitioner contends that one of Petitioner's trial counsel who advised Petitioner on his guilty plea did not provide Plaintiff the elements of these offenses nor is that counsel shown to have investigated Petitioner's charges and erroneously told Petitioner, if he pled guilty, he could be paroled in eight years. Petitioner argues that if the motion to withdraw his plea had been filed when Petitioner requested, shortly after his plea, then these facts would have been sufficient under state law for the state courts to grant his motion to withdraw his plea.

## A. REVIEW OF THE STATE RECORD

As to the procedural history, Petitioner's convictions are based upon a negotiated plea agreement and his guilty plea was entered on April 8, 2003. The Petitioner did not appeal those convictions. On August 14, 2003, the Petitioner filed his petition for post-conviction relief. (Docket Entry No. 19, Attachment A thereto at 1-17). After a hearing, the post-conviction court denied relief and Petitioner appealed. Id. at 29-33, 34. On February 9, 2005, the Tennessee Court of Criminal Appeals affirmed. (Docket Entry No. 19, Attachment C thereto). Petitioner then filed an application for permission to appeal to the Tennessee Supreme Court, that was denied on June 27, 2005. Id. Petitioner did not file a petition for the writ of certiorari in the United States Supreme Court. Petitioner filed his application for writ of habeas corpus in this action on March 6, 2006. (Docket Entry No. 1).

As to his substantive claims, Petitioner pled guilty to the aggravated rape and kidnapping of a taxi driver. Petitioner's plea agreement was for concurrent 15 years sentences to be served at 100 percent as a violent offender. On April 8, 2003, the Petitioner appeared before Judge Stella L. Hargrove, of the Circuit Court for Lawrence County, Tennessee and pled guilty to especially aggravated kidnapping and aggravated rape based upon a negotiated plea agreement. Prior to

2

entering his pleas, the Petitioner signed a form entitled "Waiver of Trial by Jury and Petition to Enter "Best Interest" Guilty Plea (North Carolina v. Alford Plea)". (Docket Entry No. 19, Attachment B thereto, at Exhibit 1). That form set forth the terms of the guilty plea: in exchange for his pleas the Petitioner was to receive a sentence of "15 years, Range I, 100% violent crime" for his conviction of aggravated rape and a "concurrent" sentence of "15 years, Range I, 100% violent crime" for his conviction for especially aggravated kidnapping. Id. at 5.

At the beginning of the plea colloquy, the state trial court explained the terms of the plea and the sentence thereunder:

> THE COURT: 12686. Best interest guilty plea. Under this paperwork– let me go over with you what the plea agreement is and you tell me if this is right. In count one you are pleading to aggravated rape, taking a 15- year sentence as a range-one standard offender. This is a 100 percent violent crime to serve.
>
> THE PETITIONER: Yes, ma'am.
>
> THE COURT: You are also pleading to especially aggravated kidnapping and taking [a] 15 years sentence, again, that is 100 percent violent crime; however, that runs concurrently with the aggravated rape for a total sentence of 15 years, 100 percent, correct?
>
> THE PETITIONER: Yes, ma'am.
>
> THE COURT: You are now signing up to be a member of the sexual registry with the TBI. No contact with the victim, Helen Atkinson. This 15 year sentence is to run concurrent with your plea agreement sentence?
>
> THE PETITIONER: Yes, ma'am.
>
> THE COURT: Is that the plea agreement?
>
> THE PETITIONER: Yes, ma'am, in my best interest.
>
> THE COURT: Any questions about what I've just said so far?
>
> THE PETITIONER: No, ma'am.

3

* * *

THE COURT: Mr. Franks, how far did you go in school?

THE PETITIONER: 8th grade, Ma'am.

THE COURT: Do you understand what is in this paperwork?

THE PETITIONER: Yes, ma'am. I read over it and I understand it. See it's my best interest. I'm not saying I'm guilty.

THE COURT: We'll go through that in just a minute. What I need to know right now is do you understand or need more time with Mr. Stovall before we go forward?

The PETITIONER: No, ma'am.

(Docket Entry No. 19, Attachment B-3 thereto, Transcript of Guilty Plea at pp. 4-7).

The trial court then asked the Petitioner why it was in his best interest to plead guilty.

Petitioner responded: "Based on the facts I have a lot of prior felonies, ma'am, and not only that,

some of the kin people turned against me and I just feel it's in my best interest,

ma'am." Id. at 11-12. To that explanation, the petitioner's attorney added the following:

> He has seven other convictions and six of them are similar to these offenses.
> Actually all seven of these are similar to these offenses. At least [range] two and
> probably range three if the jury convicted him of something less. He has stated
> there are several witnesses, I believe his cousins, that were going to testify against
> him in this case.

Id. at 12.

After questioning, the Petitioner affirmatively waived his right to a jury trial and the trial

court concluded that Petitioner's waiver was knowing, voluntary and entered upon the advice of

counsel. Id. at 12-13. The trial court asked the Petitioner whether he was under the influence of

drugs, alcohol, explained the rights that he was waiving, and asked if he had been threatened or

4

coerced. Id. at 8-11. As the plea colloquy proceeded, the trial court explained to the Petitioner

that if he were to go to trial he would face "a sentence of 15 to 60 years depending on your range

and up to $50,000 fine" on each of the charges and that the sentences could be run consecutively.

In the trial court's words, he "could be going to the penitentiary for a long time." Id. at 19-21.

The Prosecutor submitted the parties' stipulation of facts that were the bases for the plea

agreement:

> The State expected to prove that Perry Franks lived in Florence, Alabama. Held
> Helen Atkinson, a cab driver, the victim was a cab driver down there on the date
> of the offense. She picked Mr. Franks up for a cab fair. He wanted to ride around
> here. He visits relatives here in Wayne County. At some point during their ride
> here in Wayne County he produced a knife and held her at knife-point, forced her
> to pull over to a rural area and raped her. And then made her drive back to
> relatives' home in which she was able to communicated to these individuals that
> she was in trouble and they assisted her in getting away. She then went to the
> closest house where she was able to contact the authorities that she had been
> raped.

Id. at 17-18. The Petitioner's attorney added the following:

> MR. STOVALL: ... Mr. Franks is asking me, Judge, to add that they did do that
> rape kit on the victim and that DNA analysis on the flag that was in the car, that
> she supposedly cleaned herself on that and both of those test came back negative.
> It was however a positive DNA screen for some of his blood that somehow wound
> up on her blouse, I believe as; is that correct Mr. Franks?
>
> THE PETITIONER: Yes, sir.

Id. at 18-19 (emphasis added). The trial court asked the Petitioner if he knew the victim, and he

explained that he knew her brother. Id. at 19. The trial court accepted the factual basis of the

plea.

The trial court explained the ramifications of the Petitioner's plea and finally asked the

Petitioner if he wanted the trial court to accept his plea. Petitioner responded yes, and explained

5

that he was pleading guilty because it was in his best interest to do so.  After a brief discussion of

the evidence of the case, the following colloquy occurred:

> THE COURT: I'm not going to accept this plea unless you want me to.
>
> THE PETITIONER: I want you to.
>
> THE COURT: You absolutely want me to?
>
> THE PETITIONER: Yes, ma'am I do.
>
> THE COURT: You absolutely sure you want me to accept this plea?
>
> THE PETITIONER: Yes, I do.

Id. at 21-22.

Petitioner did not appeal his sentence, but after allegedly being told by some person in

prison that he would not be eligible for parole in eight years, Petitioner commenced

correspondence with his state trial counsel to withdraw his plea.  Without a response, Petitioner

filed a state post-conviction petition alleging that his trial counsel, Assistant Public Defender

Stuart Caulkins, provided ineffective assistance in failing to file a motion to withdraw his guilty

plea and in advising him that he would be eligible for parole after eight years.  Petitioner also

asserted a claim that his convictions for aggravated kidnapping and aggravated rape violated the

state constitution's prohibition against double jeopardy under theTennessee Supreme Court's

decision, State v. Anthony, 817 S.W.2d 299 (Tenn. 1991).[1]

An evidentiary hearing was held on the state post-conviction petition.  According to

Petitioner, Caulkins met him one time at the jail prior to his plea.  During that jail meeting,

_____

[1] Petitioner is no longer pursuing this claim.  (Docket Entry No. 23, Petitioner's Response at p. 3).

6

Caulkins advised Petitioner that "They're offering you 15 years at 100 percent and that's it. And if I was you, I'd take it or you might die in prison" because Petitioner's maximum exposure was 60 years. (Docket Entry No. 19, Transcript of Post-Conviction Hearing at 26).  According to Petitioner, Caulkins told him he would be eligible for parole in eight years under the plea agreement.  Petitioner testified that Caulkins did not discuss the elements of the offense, ranges of punishment, or his constitutional rights.  Id. at 26-28.

> Really didn't tell me nothing.  The only thing he really came down here and said was, "They're offering you 15 years.  Mr. Dicus there is offering you 15 years at 100 percent.  You either take– my advice would be that you take that or you're going to die in prison because you're going to get 60 years, Mr. Franks.

Id. at 28.

According to Petitioner, Michelle Bandarell had been representing him and was "trying to do a good job and help me on my case.  And then all of a sudden, she just vanished."  Id. at 28-29.  One month before the trial date, Caulkins visited him at the jail and advised him to accept the plea offer.  Id. at 29.  Caulkins advised Petitioner that he did not have a defense.  Id.  Petitioner waited until the day before his trial to accept the plea offer and asserts that he was not advised of lesser-included offenses.  Id. at 29-30.

As that state post-conviction hearing, Bob Stovall, an assistant public defender and Petitioner's counsel at his plea hearing testified that Petitioner's lead attorney was Stuart Caulkins, who had since left the Public Defender's Office.[2]  Stovall "stood in" for Caulkins at Petitioner's plea hearing.  According to Stovall, Caulkins met with Petitioner and advised him to accept the plea agreement that Caulkins had negotiated.  The day of Petitioner's plea hearing,

---

[2]There is nothing to suggest that Caulkins was unavailable for the hearing and subject to a subpoena from the Petitioner.

Stovall was scheduled to appear in court for another client's guilty plea. Rather than two attorneys out of the office to attend court, his office decided that Stovall would also handle the Petitioner's plea. Id. at 8-9.

Stovall prepared the guilty plea form and reviewed the plea agreement with Petitioner. Stovall explained the plea agreement to Petitioner's that his two 15 years sentences would be served at 100 percent, subject to no more than a 15 percent reduction for good time credits. Stovall also explained to Petitioner that based upon his prior convictions, if convicted at trial, Petitioner would face a minimum sentence of 25 years or 40 years as a range two or range three offender. In reviewing the plea form, Stovall explained:

> that he was pleading to aggravated rape, that he was taking a 15-year sentence I see Range 1 on here. Actually Range 1, I don't think that would have had a whole lot of meaning in this case, because it's a 100 percent violent crime.
>
> So [I] would have undoubtedly explained to him that 100 percent meant 100 percent, subject to no more than 15 percent good time. Which meant on a 10-years sentence, 15 percent, you would have to serve at least eight and a half years. And on a 15 [year sentence] I think we probably figured it out in the neighborhood of 13, 14 years, something like that. He would have to serve, at a minimum, before he would be eligible for release. Both of these offenses ran concurrently with each other.

Id. at p. 17. Stovall's practice was to give the defendant a copy of the plea agreement form and then review the agreement with him or her. Given the length of Petitioner's sentences, Stovall was very careful in reviewing the terms of Petitioner's plea agreement. Id. at 18-19.

Stovall insists that he did not advise Petitioner that he would have been eligible for parole in eight and a half years after his plea, because that would be true of a 10-year sentence. Moreover, Petitioner's eligibility for parole in eight and a half years "wasn't part of the plea at all" and Stovall would have "quickly corrected him on that". Id. at 22. Stovall estimates a half

8

an hour was necessary to review the plea agreement with the Petitioner in addition to other 10 or 15 minute sessions at various court appearances. Id.

Petitioner acknowledged his signature on the plea agreement form, but asserts he did not review the entire plea agreement form with Stovall. (Docket Entry No. 19, Transcript of Post-Conviction Hearing at 47). Petitioner conceded that Stovall advised him that the sentence "was 15 years at 100 percent, or something like that" as did the trial court. Petitioner described that advice as having "nothing to do with what Caulkins [his former attorney] said." Id. at 47-48.

Tammy Glass, an employee of the Public Defender's Office worked on the Petitioner's case. Id. at 58. Glass described the office's practice of delivering copies of all discovery materials to the defendant by mail or hand, including indictments. Id. at 60. Glass was "pretty sure" the Petitioner was given copies of his indictments because she "always make[s] copies of everything" and her file reflected that Petitioner was provided the discovery in February before his April guilty plea. Id. at 61-62. This Court finds that Franks' acknowlegdements at the plea colloquy about his knowledge of his blood on the victim's blouse and the lack of semen on the flag reflects that the State's proof and discovery was shared with him.

Sometime after his guilty plea, Petitioner asked a probation officer how long it would be before he became eligible for parole on a sentence of 15 years at 100 percent. According to the Petitioner, the probation officer responded: "I think it's 10 to 12 years. I don't even think you can make parole on that. I'm not for sure." Id. at 31. At that point, Petitioner spoke with Stovall who advised him that he would inform Caulkins of Petitioner's request to withdraw his plea. Id. at 32. Petitioner describes this conversation as within a week of his guilty plea. Id. Petitioner received a letter from Stovall dated June 11, 2003 that the motion to withdraw his guilty plea had

9

not been filed, and suggested that Petitioner pursue post-conviction relief. Id. at p. 33-34.

Stovall acknowledged that the Petitioner may have spoken with him within a week of his guilty plea about withdrawing his plea. (Docket Entry No. 19, Attachment A thereto, Transcript of Post-Conviction Hearing at 12). The Public Defender's Office also received correspondence from the Petitioner post-marked, May 30, 2003, June 2, 2003 and June 5, 2003, requesting the filing of a motion to withdraw his guilty plea. According to Stovall, these correspondences were received either by letter or telephone and within the 30 day time period for filing the motion. A motion to withdraw guilty plea was not filed. Id.

The state post-conviction court denied Petitioner's petition and found that although Petitioner's trial counsel failed to file a motion to withdraw the guilty plea, Petitioner would not have been successful on that motion to withdraw and thus, failed to carry his burden of proof on the prejudice element of his ineffective assistance of counsel claim:

> The [petitioner] has presented no evidence that he would have been entitled to withdraw his plea agreement in this matter. The transcript of the plea hearing in this case clearly evidences how thorough the Trial Court was in the defendant's plea. The Court made clear all of the defendant's rights in this case, exactly what his plea and sentence would be under the agreement, and that the plea was being entered freely and voluntarily. In addition, the plea agreement itself, which the defendant admitted to having read prior to entering his plea, sets forth all of the defendant's rights and the sentence to be served. The Court finds that this plea agreement was freely, intelligently, and knowingly, and voluntarily entered and the defendant has not demonstrated that he would have been entitled to withdraw his plea in this case, even had such a motion been filed.

(Docket Entry No. 19, Attachment A thereto, Final Order at pp. 29-30). Petitioner notes that the state trial court did not address whether Caulkins or Stovall were deficient in their assistance.

As to Petitioner's claim that Caulkins assured him of parole eligibility after eight years, the post-conviction trial court rejected that contention as controlling:

10

This Court finds that when the [petitioner's] plea agreement was accepted, the Court clearly told the [petitioner] that he was receiving a fifteen (15) year sentence at one hundred percent (100%) to serve. Additionally, Bob Stovall of the public defender's office testified that he would have went over the plea agreement with the [petitioner] before [the petitioner] signed it, and would have explained to [the petitioner] the meaning of his sentence that carries a mandatory one hundred percent (100%) service. Therefore, the Court finds that the defendant was aware of the effects of a fifteen (15) year sentence and how much he would serve at the time that it was entered.

Id.

On appeal, citing Strickland v. Washington, 466 U.S. 668, 693 (1984) and Hill v. Lockhart, 474 U.S. 52, 59 (1985), the Tennessee appellate court also found that Petitioner failed to establish prejudice for his ineffective assistance of counsel claim. The Tennessee Court of Criminal Appeals affirmed the state trial court:

Counsel explained the plea to the Defendant and told him that the sentences to which he was agreeing had to be served at one hundred percent. Counsel

explained to [the Defendant] that 100 percent means 100 percent, subject to no more than 15 percent good time. Which meant... on a 15 [year sentence], I think we probably figured it out in the neighborhood of 13, 14 years...[that] [the Defendant] would have to serve, at a minimum, before he would be eligible for release.

The trial court accredited Counsel's testimony on this matter and found that the Defendant "was aware of the effects of a fifteen (15) year sentence and how much he would have to serve at the time that it was entered." Accordingly, the trial court found that the Defendant was not entitled to relief on this ground. The evidence does not preponderate against the trial court's finding and we therefore find no error in the trial court's ruling on this issue.

With respect to the Public Defender's failure to file a motion to withdraw the Defendant's guilty plea, the trial court determined that the evidence of this failure was "uncontroverted." However, the trial court further found that the Defendant suffered no prejudice thereby because he "presented no evidence that he would have been entitled to withdraw his plea agreement in this manner." Accordingly, the trial court also refused to grant relief on the basis of this allegation.

11

* * *

> In this case, the Defendant contends that his plea was tainted by mistaken legal advice that he would be eligible for parole in eight years. However, as noted by the trial court, the Defendant read and signed a guilty plea document that clearly stated that his sentences were "100%"; the trial court taking the plea repeatedly told the Defendant that his sentences were one hundred percent; and Counsel testified that, prior to the Defendant pleading, he explained to the Defendant the meaning of the one hundred percent service requirement. We agree with the trial court that the Defendant has failed to demonstrate any likelihood that a motion to withdraw his plea would have been granted, and the Defendant has therefore failed to demonstrate any prejudice resulting from his lawyer's failure to file same.

(Docket Entry No. 19, Attachment C thereto, Opinion at 3-4).

For his federal petition, Petitioner cites other parts of the State record. The State's discovery file and the detention hearing testimony reflects that around 5 p.m. on Sunday, September 15, 2002, Franks called City Cab of Florence, Alabama, to send a cab to his home about 30 miles away. (See Docket Entry No. 13-6, Atkisson Statement at 1; Docket Entry No. 13-4, Transcript of Detention Hearing at 7). City Cab was owned by Tommy Atkisson. (Docket Entry No. 13-4, Transcript of Detention Hearing at 7). After some delay, Helen Atkisson, a fifty-year-old woman, responded to Franks's call. (Docket Entry No. 13-6, Atkisson Statement at 1).

Atkisson picked Franks up at about 6:00 p.m. and drove him to his cousin's home in Wayne County, Tennessee, where they arrived by 7:00 p.m. (Docket Entry No. 13-4, Transcript of Detention Hearing at p. 8). While Atkisson waited in the cab, Franks exited and spoke with the residents, Larry and Sherry Copeland. (Id.; Docket Entry No. 13-6, Atkisson Statement at 1-2). According to Atkisson, at some point prior to arriving at the Copeland residence, she received a call on her cellular telephone warning her about Franks. (Docket Entry No. 13-4, Transcript of Detention Hearing at 2, 7-8). A female caller told Atkisson that she read the paper,

12

"that he [Franks] was a rapist and not to send a female driver to that address." Id. at 7. Atkisson could not remember the identity of this caller nor whether the caller was someone from City Cab. Id. Telephone records reflect that from 5:26 p.m. that day and afterward, the only calls Atkisson received were from the City Cab office. (Docket Entry No. 13-14, Atkisson Telephone Records; Docket Entry No. 13-15, City Cab Telephone Records).

Atkisson did not leave Franks at the Copeland residence, and after his visit, Atkisson drove Franks to the Starlite Club, where Franks bought a six-pack of beer. (Docket Entry No. 13-4, Transcript of Detention Hearing at 8-9; Docket Entry No. 13-6, Atkisson Statement at 2). Atkisson resumed driving and followed Franks's directions for "a long way" down country roads until she pulled over to allow Franks to relieve himself. (Docket Entry No. 13-6, Atkisson Statement at 2).

According to Atkisson, at that point Franks first became threatening and forced her to have sex. Id. at 2-3. Atkisson had mace "right beside" her, but she did not use it. (Docket Entry No. 13-4, Transcript of Detention Hearing at 10). Franks used a kitchen knife to force her to undress, and to get in the back seat, and to have sexual intercourse. (Docket Entry No. 13-6, Atkisson Statement at 2-3). Petitioner notes that Atkisson had "four sips" of beer after and "during the attack." (Docket Entry No. 13-4, Transcript of Detention Hearing at 9). Atkisson did not see the knife again until police later found it on her front floorboard. Id. at 10-11. According to Atkisson, Franks did not threaten her again. See Id. at 4, 1; Docket Entry No. 13-6, Atkisson Statement at 3).

Atkisson explained that for her personal safety, she placated Franks: "I kept convincing him that I wouldn't tell that it was our secret, that I enjoyed it and that I wanted to see him again

13

and all this to try to get to safety." (Docket Entry No. 13-4, Transcript of Detention Hearing at 4). After about an hour of driving, Atkisson returned to the Copeland residence at about 10 p.m., three hours after their first stop. Id. at 2; Docket Entry No. 13-6, Atkisson Statement at 3; Docket Entry No. 13-10, S. Copeland Statement; Docket Entry No. 13-11, L. Copeland Statement.

Franks presented Atkisson to the Copelands as his "girlfriend" and went into the backyard to speak with Larry Copeland. (Docket Entry no. 13-4, Transcript of Detention Hearing at 11; Docket Entry No. 13-10, S. Copeland Statement). Atkisson then told Sherry Copeland that Franks had raped her and asked her for help. Id. Sherry did not call the police but as a ruse, called a friend Ricky McFalls, to take Franks away and allowed Atkisson to leave. Id. McFalls did so and Atkisson left with directions as to how to get back to Florence. Id.

A missing-person bulletin had been issued for Atkisson, because her cellular telephone was left at the scene of the rape and she failed to answer calls since 7:35 p.m. onward. (Docket Entry No.13-1413, Atkisson Telephone Records at Entry 449; Docket Entry No.13-9, Short Statement). Before she was found, Atkisson stopped at about 10:18 p.m. at the first home she saw and told the residents that she had been raped; and asked them to call Wayne County authorities. (Docket Entry No. 13-6, Atkisson Statement at 4; Docket Entry No. 13-12, Wayne County Memo). Sergeant Short was the first to locate Atkisson who was parked in the driveway of that home. (Docket Entry No.13-9, Short Statement). According to Sergeant Short:

> I made contact with Ms. Atkisson and saw she was ok. We got her in her vehicle and were going to escort her back to Florence. I did not know at this time that she had been raped. I retrieved a knife from the front passenger[s] side of her vehicle. As we were leaving we were radioed by our dispatcher and informed that we needed to return with the victim back to the house that we found her. We then

14

found out that Ms. Atkisson had been raped. She had not informed me of that.

(Id. at p.1).

The rape test result was negative, and semen was not discovered in the cab nor on any of Atkisson's clothing. (Docket Entry No. 13-7, Serology/DNA Report at pp.1-2; Docket Entry No.13-8, Finger Print Report). Some blood was on the knife and Atkisson's shirt. That blood matched Frank's blood sample. Franks's fingerprints were not found on the knife.

## B. CONCLUSIONS OF LAW

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal

law, as determined by the Supreme Court of the United States"as referring to "the holdings as opposed to the dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the petitioner's] state court conviction became final." Id. at 390; accord, Joshua v. Dewitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

Yet, the Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," Williams, 529 U.S. at 409, and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "'state court decision is so clearly incorrect that it would not be debatable among reasonable

16

jurists.'" Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson,

97 F.3d 751, 769 (5th Cir. 1996)).

### 1. Ineffective Assistance of Counsel

As to Petitioner's ineffective assistance of counsel claims, the Sixth Circuit identified two

broad categories of ineffective assistance of counsel claims under the Supreme Court's decisions:

(1) the actual or effective absence of counsel at a critical stage of the proceeding for which a

presumption of prejudice arises; and (2) counsel whose performance was deficient on specific

issues and that deficiency was demonstrably prejudicial to the defendant. As that Court

explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984),
> the Supreme Court held that an appeals court must reverse a criminal defendant's
> conviction "without any specific showing of prejudice to defendant when counsel
> was either totally absent, or prevented from assisting the accused during a critical
> stage of the proceeding."... In Williams, the Supreme Court confirmed the vitality
> of this "per se" approach, noting that while the Strickland v. Washington, 466
> U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of
> counsel, requiring proof of deficient performance and prejudice, provides
> guidance for resolving virtually all ineffective assistance of counsel claims, there
> are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at
> 391 (citing Strickland, 466 U.S. at 692, 104 S.ct. 2052). We have recently applied
> the presumption-of-prejudice test to a claim of ineffective assistance of counsel.
> Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during
> prosecution's presentation of evidence that implicates defendant because such
> absence occurred during "critical stage" of trial).

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir.2003).

Within the first category are three types of cases warranting the presumption-of-prejudice

analysis:

> The first is the complete denial of counsel, in which "the accused is denied the
> presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic,
> 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to

17

subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

For his claims that Caulkins failed to investigate his case, failed to describe the elements of the offenses to which Petitioner pled guilty, and failed to file his motion to withdraw Petitioner's plea, Petitioner contends that his ineffective assistance of counsel claim falls under the complete denial of counsel category. The Court disagrees. First, none of these factual allegations were deemed prove in the state courts. Petitioner does not offer any proof in this action to reject those state courts' findings.

As to Petitioner's reliance on Cronic, the Respondent argues that in Bell v. Cone, 535 U.S. 685 (2002), the United States Supreme Court clarified as applicable only for (1) a "complete denial of counsel" during a "critical stage" of the proceeding that has "significant consequences" for the petitioner; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) when "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." Id. at 696. The Court concludes that none of those exceptions is presented here.

As to Petitioner's reliance on Roe v. Flores-Ortega, 528 U.S. 470 (2000), for a presumption of prejudice, Flores-Ortega rejected the Ninth Circuit's presumed prejudice doctrine for a counsel's failure to file a notice of appeal. Id. at 484. The Supreme Court held that enven in such instances, "a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Id. As discussed below, the best evidence of a lack of prejudice here is that the State

18

courts rejected Petitioner's assertion that his motion to withdraw his plea would have been granted, if filed.

To prevail on his claims of ineffective assistance, Petitioner must demonstrate that, under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performances were prejudicial. Strickland, 466 U.S. at 695. As the Supreme Court has explained:

> First the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Included in the reasonableness of a counsel's performance is the duty to investigate. As to the duty to investigate, the Supreme Court in Strickland explained that:

> [t]hese standards require no special amplification in order to define counsel's duty to investigate. . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all thecircumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the

19

defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id at 690-91.

For a guilty plea, state trial courts are required to advise state defendants of his rights under the Due Process Clause of the Fourteenth Amendment to ensure a voluntary and knowing plea of guilty. Boykin v. Alabama, 395 U.S. 238, 242 (1969). The record should reflect a full understanding of the direct consequences so that the plea represents a voluntary and intelligent choice among the alternatives. North Carolina v. Alford, 400 U.S. 25, 31(1970). Yet, the fact that the state trial court did not so inform the petitioner in the court's examination of the defendant at the guilty plea proceeding does not invalidate his plea under Boykin. "We agree with the other Circuits that Boykin does not require separate enumeration of each right waived and separate waivers as to each". Fontaine v. United States, 526 F.2d 574, 576 (6th Cir. 1976). Accord, Campbell v. Marshall, 769 F.2d 314, 317, 320-21 (6th Cir. 1985).

As pertinent here, the Constitution requires that a defendant be informed of the direct consequences of his plea. Brady v. United States, 397 U.S. 742, 755 (1970). While the maximum possible sentence is one such consequence, Riggins v. McMackin, 935 F.2d 790, 796 (6th Cir. 1991), eligibility for parole is not. Brown v. Perini, 718 F.2d 784, 788 (6th Cir. 1983); Armstrong v. Egeler, 563 F.2d 796, 800 (6th Cir. 1977). Counsel's expectation about the sentence

20

are not grounds for invalidating the plea agreement. <u>Stout v. United States</u>, 508 F.2d 951, 953 (6th Cir. 1975), unless there was a gross error. <u>Sparks v. Sowders</u>, 852 F.2d 882, 885 (6th Cir. 1988).

When the Defendant's conviction is based upon a guilty plea, the question is "whether counsel's constitutionally ineffective performance affected the outcome of the plea process." <u>Lockhart</u>, 474 U.S. at 59. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Id.</u>

As to the ineffectiveness of Petitioner's counsel at his guilty, the plea colloquy reflects that Petitioner had stipulation to the State's proof that reflects his prior discussion of the State's proof with his counsel. By his statements at the plea colloquy, Petitioner was aware of certain items in the State's discovery favorable to him and that the State's proof would include his relatives testimony. Stovall, who handled the plea, reviewed the terms of the plea agreement with Petitioner as well as Petitioner's sentencing options. The state trial court finding "that the defendant was aware of the effects of a fifteen (15) year sentence and how much he would have to serve at the time that it was entered," is supported by the evidence and is reasonable. The state court also noted that "the plea agreement entered... the defendant admitted to having read, clearly states that the defendant understands the charges against him and has discussed these matters with his attorney." (Docket Entry No. 19-2, Technical Record at p. 30). The state trial court also found the Petitioner understood the nature of the charges against him, citing the discovery information provided by the prosecution and his receipt of a copy of the indictment.

[F]rom the proof at the hearing it appears that the defendant did speak on

21

numerous occasions with at least three different attorneys with the public defender's office, and as evidence[d] by his statements at the plea hearing, was well ware of the charges and evidence that would have been used against him at a trial in this matter.

Id. at p. 31.  Significantly, his post-conviction on appeal, Petitioner did no challenge the post-conviction court's finding that he understood the nature of the charges against him.  The Tennessee Court of Criminal Appeals concluded that the record did not preponderate against the lower court's finding that the Petitioner understood his plea agreement and failed to present any evidence that would have supported a motion to withdraw his guilty plea.

Given the lack of an express state courts' factual finding, the Court accepts Petitioner's assertion that Caulkins and the state trial court did not review the elements of the offense.  This claim was not presented to the state courts.  In any event, given that Petitioner had seven prior convictions for similar conduct, coupled with the stipulation of facts about his conduct, if true, this fact would not necessarily invalidate his plea as the constitutional requirements for a plea colloquy are not rigid.  Here,  Petitioner's decision to plead guilty was a best interest plea that was based upon his criminal history and the fact that family members were going to be state witnesses at his trial.  Thus, the Court concludes that the state courts' rulings on Petitioner's ineffective assistance claims are supported by the record and are reasonable application of federal law.

Petitioner contends that the state courts unreasonably applied the prejudice prong of Strickland to his claim that his trial counsel failed to file a motion to withdraw his guilty plea.  Petitioner argues that based upon state court precedents, his motion to withdraw would likely have been granted, given Petitioner's misunderstanding of the effects of the plea on his parole

status. Petitioner asserts that he is only required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Yet, the only evidence the Petitioner presented in support of his claim that he could have prevailed on his motion to withdraw his guilty plea, is his assertion and citation to state law. The best indicator that Tennessee courts would not have granted Petitioner's motion are the actual decisions of the sentencing judge and the appellate court on that contention. This Court concludes that Petitioner has not proven prejudice that the state courts finding of a lack of prejudice is unreasonable.

For these reasons, Respondent's motion to dismiss (Docket Entry No. 22), should be granted and the Petitioner's cross motion to grant the petition (Docket Entry No. 23) should be denied.

An appropriate Order is filed herewith.

Entered this the _15th_ day of October, 2007.

William J. Haynes, Jr.
United States District Judge

23